## Pope and another v. Filley.

(*Circuit Court, E. D. Missouri.* October 3, 1881.)

1. CONTRACT OF SALE CONSTRUED—LEX LOCI CONTRACTUS—EVIDENCE, INADMISSIBILITY OF PAROL, TO ADD TO A WRITTEN CONTRACT—BURDEN OF PROOF—EXPERT TESTIMONY—MEASURE OF DAMAGES.

Where a contract of sale was entered into in St. Louis, whereby the vendors agreed to ship the vendee 500 tons of "No. 1 Shott's Scotch pig-iron  *  *  * from Glasgow, as soon as possible," and deliver it to him in bond at New Orleans, for $26 per ton; and they shipped that amount of iron from Leith, and tendered it to the vendee, who refused to accept it, and the vendors thereupon had it sold by a broker for all it would bring, and sued the vendee for damages,—*held*,

(1) That the burden of proof was upon the vendors to show that they had fully complied with the terms of the contract on their part.

(2) That the fact that the iron was shipped from Leith instead of Glasgow was immaterial.

(3) That it was necessary for the vendors to show a compliance with the contract as to time of shipment, but that "shipment  *  *  * as soon as possible" meant as soon as possible by any ordinary mode of transportation.

(4) That parol evidence was inadmissible to show that, by the custom of merchants, shipment should be by sail, unless it is specified that it shall be by steam.

(5) That the term "No. 1 Shott's Scotch pig-iron," as used in said contract, should be understood as having the meaning usually given it by persons engaged in the iron trade in St. Louis.

(6) That evidence was inadmissible to show what, in the opinion of merchants and business men in Glasgow, the contract means.

(7) That the vendors could not recover unless they proved a tender of iron of the quality called for by the contract.

(8) That the only persons who were competent to testify as experts concerning the quality of the iron were those who had given the subject of manufacturing and testing iron special attention, and had experience in the art, and had examined the iron in question.

(9) That evidence of the manner in which "No. 1 Shott's Scotch pig-iron" is examined and marked at the foundry, was inadmissible for the purpose of showing the quality of the iron tendered.

(10) That in case the vendors showed a compliance on their part with the terms of the contract, and a refusal on the part of the vendee to accept the iron, the measure of damages would be the difference between the contract price, together with interest thereon from the date of the tender, and the price for which the iron was sold, less the ordinary and usual commission paid brokers for negotiating such sales.

McCRARY, C. J., in ruling upon objections to portions of depositions offered in evidence by the plaintiffs, said:

I have considered the objections to certain portions of the depositions of witnesses sworn on behalf of plaintiffs, and my conclusions may be stated generally as follows:

v.9,no.2—5

1. As to shipment "from Glasgow." This is not a condition precedent. If in anywise material it would be an independent covenant, not going to the whole consideration, and for a breach of which an action for damages would lie. But, in my judgment, it is not material. The purpose for which defendant made the contract was to secure, as soon as possible, a given quantity of a given quality of iron.

Whether the vessel carrying it should depart from Glasgow or Leith was immaterial.

2. Shipment "as soon as possible" is a natural and important provision of the contract. It required shipment as soon as possible by any of the ordinary modes of transportation. Parol testimony is not admissible to vary the language so that it may read "as soon as possible *by sail*."

Proof of a custom of merchants to ship by sail, unless specifically directed to ship by steam, is not admissible, nor can the plaintiffs be permitted to show by parol what, in the opinion of merchants and business men in Glasgow, the contract means.

3. The quality of the iron cannot be shown by proof of a custom of the foundry as to examining and marking.

It must be shown by the testimony of competent judges who have examined it. To be competent to testify as an expert upon this subject a witness must show that he is skilled in the business of manufacturing iron.

A clerk or book-keeper, although he may have been long employed in an iron foundry, and may have seen the business conducted, is not competent to testify as an expert unless he shows by his testimony that he has given the subject of examining and testing iron special attention and study, and has had experience in that art.

If it appears that he relies upon the decision of others, or upon the marks on the iron, he is not an expert. Accordingly, the testimony of Lindsey, in so far as he gives his opinion as to the quality of the iron, or testifies as to the customary mode of determining the quality, is excluded.

In accordance with these conclusions I have passed upon the several objections to testimony, and have marked them "sustained" or "overruled."

McCRARY, C. J., subsequently charged the jury as follows:

*Gentlemen of the jury*: The counsel, in order to bring this case to a conclusion to-day, have consented that it may be submitted to you without oral argument on the charge which the court shall give you.

Plaintiffs sue the defendant upon a written contract, and allege that the defendant has failed to comply with his obligations as expressed in that contract. The contract is very brief, and is in the following words:

### "SALE MEMORANDUM.

"St. Louis, February 20, 1880.

"*Thomas J. Pope & Brother, New York:* Have sold for your account to Mr. O. B. Filley, in St. Louis, 500 tons No. 1 Shott's Scotch pig-iron, at $26 per ton, cash, in bond at New Orleans; shipment from Glasgow as soon as possible; delivery and sale subject to ocean risks.

"Yours, truly, MILLARD & COMBS."

This is the contract. The allegation of the plaintiffs here is that, in pursuance of that contract, they caused to be shipped the iron mentioned in that contract, of the quality described, and within the time required, which iron was, they allege, delivered in New Orleans in bond, in accordance with the agreement, and tendered to the defendants, who refused to take it.

There is no dispute about some of the questions which are involved in this case. The execution of this contract is admitted. The shipment of 500 tons of iron from Leith to New Orleans is admitted. The tender of this iron to the defendant is admitted, and his refusal to accept is admitted.

The principal controversy arises upon the question whether plaintiffs themselves have fully complied with the terms of their agreement, and that is the question for you to determine upon the facts in the case, in accordance with the law as the court will give it to you. I say to you, however, as preliminary to that, that if it appears from the proof, to your satisfaction, that plaintiffs did comply with the contract on their part, and that the defendant refused to take the iron after the plaintiffs had so complied, then it was the privilege and the right of the plaintiffs to sell the iron in the market for the best price it would bring, and to charge the defendant with the difference between what it brought in the market and the price which he was to pay for it.

I believe there is no dispute, either, as to the price the iron brought. It was sold, I think, according to the testimony, at $15 per ton. The price named in this contract was $26 per ton; so if you find that the plaintiffs did comply with their part of this agreement, in all its material provisions, and that, notwithstanding that compliance, defendant failed to accept the iron when it was tendered to him, your verdict would be for the plaintiffs, and the amount of your verdict

would be the difference between the price at which the iron was sold, to-wit, $15 per ton, and the contract price, $26 per ton; also, in addition to that, the reasonable expenses of the resale, which would be the ordinary and usual commission of the broker, not necessarily the sum that was agreed on between the broker and these plaintiffs, because that would not bind the defendant, but the ordinary and usual commission would be all that could be recovered.

*Mr. Hitchcock.* There is no dispute about that; I will say 2½ per cent.

*Judge McCrary.* Which would be, according to the testimony here, 2½ per cent. on the amount of the sale; so your inquiry here, gentlemen, must be simply into the question of whether these plaintiffs complied with the contract upon which this suit is brought.

One of the provisions of the contract is that the iron was to be shipped from Glasgow, and I instruct you, as a matter of law, that that is not a material provision of the contract so far as this controversy is concerned. The purpose of the contract was the sale, by the plaintiff to the defendant, of a certain quality of iron, to be delivered in a certain time, at a certain place, and the fact that it was shipped from Leith instead of Glasgow is not material to the rights of the parties in this case if the other provisions of the contract were all complied with; so that that provision of the contract need give you no trouble. It is agreed here, and not questioned, that the iron was shipped from Leith instead of Glasgow.

Another provision of the contract is that the iron should be shipped as soon as possible, and upon this there has been some controversy, and it will be for you to decide whether, under the evidence, the iron was shipped by the parties in Scotland, who acted on behalf of these plaintiffs, as soon as possible after the order was received.

The meaning of that clause of the contract is that these parties were to use all reasonable diligence to ship as soon as possible. The time in such a case is of course important, and it was especially important in this case, because the parties saw fit, in their contract, to say that the iron should be shipped as soon as possible; but, if it was shipped by the first conveyance that could be had, and due diligence was used, then that part of the contract has been complied with.

The main controversy is, as you have already seen in the course of the testimony, as to whether the iron which was shipped to New Orleans and tendered to the defendant was of the quality designated and described in the contract, to-wit, No. 1 Shott's Scotch pig-iron.

Those are the words, gentlemen, which are used in the trade, which are peculiar to the business of the iron merchant. They are not words the meaning of which persons would ordinarily understand. Men who have no knowledge of the business of an iron merchant, or of the manufacture and sale of iron, would not be able to determine the question of what is meant by No. 1 Shott's Scotch pig-iron. Hence it is that the court has allowed testimony to be offered to you as to the understanding of iron merchants upon this subject as to the meaning that attaches to these words when they are used in the trade by dealers in iron.

This contract, as you observe, was executed in St. Louis, and I charge you that it must be understood to have referred to the term here. It must be understood that the parties used these words with the meaning that they have among iron merchants in this city, and you have had a good deal of testimony from the witnesses on both sides as to what is meant by those words—as to what quality of iron is described by those terms. I do not propose to go into recapitulation of the testimony, such as has been given to you, but I say to you that it is for you to determine from this testimony what those words do mean, as they are understood by iron merchants in St. Louis, and when you have determined that question then you are to inquire and decide whether the iron which was tendered to the defendant came up to and filled the requirement of such description.

If you find that the iron which was tendered was not within this definition, No. 1 Shott's Scotch pig-iron, then it does not follow the contract, and the plaintiffs cannot recover. But, on the other hand, if you find from the evidence that the iron was of the description named in the contract, as understood by the merchants here, where the contract was made, then the plaintiff has fulfilled that part of the contract, and is entitled to recover, if you find that he has fulfilled the other portions of the contract.

You have before you, gentlemen, the testimony of a great number of experts on this subject. It would take a great deal of time, and be to no purpose, for me to enter into a discussion of the testimony itself. It is for you to take it all and consider it fairly and dispassionately, and determine from it whether the contract in this respect has been complied with or not. All that I need to say to you, as a matter of law, is that the burden is on the plaintiff to show that he has complied with the contract, not only with regard to the time of the shipment, but with respect to the quality of the iron which was shipped and tendered to the defendant.

The counsel have suggested some instructions, gentlemen, which I, probably, have anticipated in part, but I will refer to them. And first, on behalf of the plaintiff, I was asked to say to you as follows:

"The jury is instructed that the words, 'as soon as possible,' used in this contract, are to be here construed in the ordinary, reasonable sense in which such expressions are used in business. They are to be understood in the light of all the circumstances under which the contract was made, and with reference to the course of trade in shipping iron from Glasgow."

This clause did not make it obligatory upon the plaintiffs to do everything which was possible as a physical act, if such act lay beyond what shippers of iron might reasonably be expected to do.

So far as the obligation of this clause of the contract is concerned it is sufficient if the jury find that plaintiffs diligently made every reasonable effort, in the usual course of commerce, to effect the prompt shipment of the iron.

That, I think, is a correct statement of the rule, and substantially what I have already stated to you. Plaintiffs also request me to say to you as follows:

"The court instructs the jury that, under the contract sued upon, it was the right, if not the duty, of the plaintiffs to cause the iron designated therein to be shipped to New Orleans as soon after the contract was made as they could do so by exercising all proper and reasonable diligence and judgment.

"If the jury find that it was impossible for plaintiffs to obtain a vessel from Glasgow, and that it was practicable to obtain one from Leith, and that shipment from Leith was a more expeditious way of getting the iron to New Orleans than waiting for a vessel from Glasgow would have been, then plaintiffs were justified in shipping the iron from Leith instead of Glasgow."

That is given as requested.

The defendant's counsel requests the court to instruct as follows:

"The jury are instructed that the contract sued on was an entire contract for the entire quantity of 500 tons of pig-iron of the description and grade mentioned in the contract, and the defendant was not bound to receive any of said iron unless the entire quantity so contracted for did in fact answer to the description called for by the contract."

Of course, gentlemen, under this contract the defendant was not bound to accept any part of the 500 tons unless the whole was tendered him. I do not, myself, remember any testimony tending to show that a smaller part was tendered.

*Mr. Hitchcock.* No, there is no dispute as to that; it is not as to how much was tendered.

*Judge McCrary.* Very well, sir; I say that is a correct rule, at all events. I say, furthermore, at the request of defendants:

"It is incumbent upon the plaintiffs in this cause, before the jury can find that the plaintiffs did fulfil the conditions of said contract on their part, to prove to the satisfaction of the jury not only that a part of the 500 tons alleged to have been tendered to the defendant by them under this contract was of the description contracted for, but that the whole of said 500 tons was of that description. Under the contract sued on it was not incumbent upon the defendant to receive any less quantity than 500 tons of the description contracted for, and it is incumbent on the plaintiffs, before they can recover for any part of the iron claimed to have been tendered by them to defendant, to prove that the whole of said quantity so tendered by them was of the description contracted for."

I give you that instruction, gentlemen, with this qualification, of course: it is not necessary that they should prove that every individual pig was alike. It is necessary that they should show that the lot, as a lot, came up to the description given in the contract.

It is a question of fact for the jury to determine upon the evidence before them, and under the instructions of the court, what description of iron the parties to the contract sued on meant by the term in the contract, viz., No. 1 Shott's Scotch pig-iron. The contract having been made in St. Louis, Missouri, any local or peculiar terms, or terms peculiar to the iron trade, which may be found in said contract, are to be understood as having whatever meaning was usually given to such terms by persons engaged in the iron trade in that city.

Evidence has been introduced tending to show what is the meaning of that phrase, according to the usages of that trade in this market, and it is for the jury to consider and find upon that evidence what was the meaning of those words, viz., "No. 1 Shott's Scotch pig-iron," as understood by persons engaged in the iron trade in St. Louis. If the jury shall believe from the evidence before them that, according to the usages of persons dealing in and using pig-iron in St. Louis, the words "No. 1 Shott's Scotch pig-iron" were understood by such persons to mean pig-iron made in Scotland, Shott's furnace, and of such grade as should correspond to the grade of Scotch pig-iron commonly described or recognized in this market as No. 1, then the jury cannot find that the plaintiffs fulfilled their part of the contract sued on, unless the jury shall be satisfied, from the whole evidence before them, that the 500 tons of iron which was offered by the plaintiffs to the defendant on or about the twenty-sixth of May, 1880, was iron made at Shott's furnace in Scotland, and did correspond, as to the grade thereof, with the grade of pig-iron usually known in this market as No. 1 when applied to Scotch pig-iron.

If the jury shall find from the evidence, according to the usage of

this market, the description of No. 1 Shott's Scotch pig-iron was understood by persons dealing in and using pig-iron as a description of iron such as is last mentioned, and that plaintiffs have failed to prove to the satisfaction of the jury that said 500 tons so offered to the defendant by them did, in fact, correspond with that description, then the jury should find for the defendant in this case.

That is, gentlemen, only to repeat in substance what I have said to you, that you are to determine from the evidence in this case what quality of iron was called for by that description as understood by iron merchants in St. Louis, where the contract was made, and then you are to inquire and determine whether that quality of iron was tendered to the defendant. If you should find for the plaintiffs, gentlemen, your verdict will be for the difference between the contract price of the iron and the price for which it was sold, less the costs of the sale, and interest at 6 per cent. from the date of the tender, as shown by the evidence.

If you find for the defendant the form of your verdict will be, "We, the jury, find for defendant."